**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST SAINT LOUIS DIVISION**

MARION DIAGNOSTIC CENTER, LLC )
and MARION HEALTHCARE, LLC, )
individually and on behalf of all others )
similarly situated, )
)
              Plaintiffs, )    Case No. 3:18-cv-01059-NJR
)
       v. )
)    JURY TRIAL DEMANDED
BECTON, DICKINSON, AND COMPANY; )
CARDINAL HEALTH, INC.; and )
MCKESSON MEDICAL-SURGICAL INC., )
)
            Defendants. )

**DEFENDANT BECTON, DICKINSON AND COMPANY'S MOTION TO**
**DISMISS AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

      Defendant Becton, Dickinson and Company ("BD") moves under Federal Rule of

Civil Procedure 12(b)(6) to dismiss, with prejudice, the Second Amended Class Action

Complaint ("SAC") of Plaintiffs Marion Diagnostic Center, LLC and Marion Healthcare, LLC

("Plaintiffs"), and respectfully submits this memorandum of law in support of its motion.

**INTRODUCTION**

      The Seventh Circuit granted Plaintiffs' request to file one more amended

complaint -- what it called Plaintiffs' "last-gasp effort" -- to try to plead an antitrust claim against

BD that is not barred by *Illinois Brick*. (Certified Final Op. ("Op.") 15, ECF No. 130 -1.) In

their latest complaint, Plaintiffs again contend that they have standing to sue BD under the

"conspiracy exception" to the direct purchaser rule. (Second Am. Compl. ("SAC"), ECF

No. 150.) Yet, even though the Seventh Circuit gave Plaintiffs a roadmap for alleging a viable

antitrust conspiracy, they have failed to follow those directions.  Thus, the new amended complaint should be dismissed, with prejudice.

On appeal from this Court's dismissal of the prior complaint, the Seventh Circuit held that the "conspiracy exception" is not limited only to price-fixing cases.  It found that the complaint should not have been dismissed solely on a "categorical" basis but, rather, that this Court should have examined "any additional detail about the structure of the conspiracy." (Op. 16.)  The Seventh Circuit then itself examined the "additional detail" of the alleged conspiracy and found, based on its own review of the pleading, that the complaint failed to allege an actionable conspiracy and thus failed to establish that plaintiffs had standing.  "Without any allegation that the distributors coordinated with Becton to profit from the anticompetitive scheme, their case is barred under *Illinois Brick*."  (*Id.* at 15.)

The Seventh Circuit explained why Plaintiffs' prior pleading failed to adequately allege a conspiracy, and what they would need to allege in order to avoid dismissal again. Specifically, it held that the complaint failed to allege facts sufficient to show that the distributors joined a conspiracy with BD, and also failed to allege facts sufficient to show that the distributors conspired *with each other*.  "The complaint has nothing to say about any involvement that the distributors may have in inflating [BD's] prices, or whether they coordinate among each other or with Becton or the GPOs as part of the conspiracy."  (*Id.* at 13.)  That failure was fatal:  "If the distributors were not part of the alleged conspiracy, then the Providers' case falls apart:  no conspiracy, no direct purchaser status, no right to recovery."  (*Id.* at 12.)

The Seventh Circuit made clear what Plaintiffs would have to allege -- with sufficient facts, of course -- to plead the "hub-and-spokes" conspiracy that Plaintiffs had asserted:  "As applied to our case, the Providers must allege that the distributors, in addition to

coordinating with Becton, would not have attempted to inflate prices without assurance that each distributor was abiding by the agreement and behaving in the same way." (*Id.* at 13.) In short, Plaintiffs would have to allege not only a vertical conspiracy between the distributors and BD, but also a horizontal conspiracy between the distributors themselves. At that, the Seventh Circuit found, Plaintiffs failed. "All the Providers have alleged is that the distributors buy and sell the devices in accordance with the terms of the contracts that the GPOs have negotiated." (*Id.* at 15.) That was "insufficient to find a conspiracy between the distributors and Becton," or a conspiracy among the distributors themselves. (*Id.* at 13–14.)

Plaintiffs have paid no heed to the Seventh Circuit's holding. They have not alleged any new facts to establish a vertical conspiracy between either of the distributor defendants and BD. And instead of adding factual allegations to establish a horizontal conspiracy among the distributors, Plaintiffs have abandoned their claim of such a conspiracy. They dropped two of the original distributor defendants (along with other "unnamed Becton distributor co-conspirators" alleged in the first amended complaint, (Am. Compl. ("AC") ¶ 31, ECF No. 52), and they now allege that the remaining two distributors acted "independent" of each other (SAC ¶ 23).

That just makes Plaintiffs' pleading worse. Absent collusion among the rival distributors, Plaintiffs concede that it would make no sense for a distributor to enter into an independent conspiracy with BD to charge inflated prices. The non-conspiring distributors would simply undercut the inflated prices and take business away from the conspiring distributor. (SAC ¶ 61.) Given that Plaintiffs now disclaim any allegation of horizontal collusion, what they are left with is the same *unilateral* business conduct that the Seventh Circuit found insufficient to allege an antitrust conspiracy.

The Seventh Circuit already considered and rejected as "insufficient" each of the allegations that the distributors participated in a conspiracy with BD: (1) that the distributors agree to distribute Becton's products pursuant to "anticompetitive contractual terms," (2) that the distributors "enforce Becton's penalty pricing," and (3) that the distributors make payments to the GPOs based on the volume of sales under the contracts. (Op. 14–15.) The few seemingly new allegations in the SAC -- *e.g.*, that distributors' sales personnel sometimes "lied" in order to sell more BD products -- cannot change that outcome. (SAC ¶ 48.) Those allegations are just different versions of what the Seventh Circuit already found to be deficient: that distributors financially benefit when they promote BD's products over those of competitors. (*Id.* at 4, 13–15.) And Plaintiffs do not allege that the distributors coordinated their supposed "lies" with each other or with BD.

Since Plaintiffs again have failed to plead any actionable conspiracy, they again have failed to establish standing under the "conspiracy exception" to *Illinois Brick*. Accordingly, the SAC should be dismissed, with prejudice.

## BACKGROUND

Plaintiffs Marion Diagnostic and Marion HealthCare operate surgery facilities in Illinois. (SAC ¶¶ 8–9.) BD is a New Jersey corporation that makes conventional syringes, safety syringes, and safety IV catheters. (SAC ¶¶ 8, 10.) Plaintiffs buy BD products, but not directly from BD. Rather, they purchase from distributors. Two distributors, out of many in the market, are named as defendants: Cardinal and McKesson. (SAC ¶¶ 11–12.)

### A. The Previous Complaint

The original Amended Complaint reviewed by the Seventh Circuit named BD, two group purchasing organizations ("GPOs"), and four named distributors and additional unnamed distributors as co-conspirator defendants. (AC ¶¶ 12–18.) The gravamen of that

pleading was that BD negotiated "anticompetitive" agreements with the GPOs which excluded BD's competitors from the market. (AC ¶¶ 54–56.)

Plaintiffs alleged that the distributors' anticompetitive support for BD included entering into "Dealer Notification Agreements" with BD to "further the conspiracy in three ways": (1) agreeing to distribute BD's products pursuant to the allegedly anticompetitive terms of BD's contracts with GPOs; (2) agreeing to enforce BD's "penalty pricing system"; and (3) making "additional anticompetitive cash payments to the GPOs," based on the volume of BD sales under the contracts. (AC ¶ 45.) Plaintiffs also alleged that BD "pays extra commissions to the distributors' sales personnel who sell Becton products to the exclusion of competitors' products;" "requires that distributors' promotional materials emphasize Becton as the preferred brand;" and "asked Cardinal, its largest distributor by far, to commit to not induce a Becton customer to purchase a competitor's products." (AC ¶ 46.) BD allegedly paid the distributors for their role in protecting its monopoly power through fees "computed based on Becton's above-competitive pricing," high sales commissions, and a guarantee of "stable business." (AC ¶ 57.)

BD moved to dismiss on the grounds that Plaintiffs did not purchase directly from BD and hence lacked direct purchaser standing under the *Illinois Brick* rule. (ECF No. 83.) This Court dismissed the complaint. (Mem. Order, ECF No. 117.)

### B. The Seventh Circuit's Opinion

On appeal, the Seventh Circuit found that Plaintiffs did not properly allege a conspiracy, but vacated and remanded with specific guidance for evaluation of Plaintiffs' amended pleading on remand. It first found that the "conspiracy exception" to *Illinois Brick* is not limited to "simple vertical price-fixing." (Op. 3.) It held that "[p]rovided that our plaintiffs have properly alleged a conspiracy, they may sue for whatever forms of anticompetitive conduct

5

they are able plausibly to allege." (*Id.* at 12.) However, it found that Plaintiffs had *not* properly alleged a conspiracy: "As the complaint now stands, the [Plaintiff] Providers have not shown that the distributors made a conscious commitment to participate in an illegal scheme." (*Id.* at 15.)

The Court examined all of the anticompetitive and conspiratorial conduct alleged by Plaintiffs, and found it legally insufficient. It rejected the assertion that a conspiracy could be found based on allegations that the distributors "buy and sell the devices according to the terms of contracts that the GPOs allegedly negotiated in a crooked fashion." (*Id.* at 13–14.) In particular, it found that the three alleged "activities" described above (and in both the prior complaint, AC ¶ 45, and the new one, SAC ¶ 44) were not an adequate basis for pleading a conspiracy: (1) distributing products pursuant to BD's anticompetitive contracts with GPOs, (2) enforcing BD's "penalty pricing" system, and (3) making payments to the GPOs based on volume of BD sales. (Op. 14–15.)

In sum, the Court held that "[w]ithout an allegation that the distributors have participated in the conspiracy or knowingly engaged in parallel anticompetitive conduct," Plaintiffs cannot establish the conspiracy exception to *Illinois Brick*. (*Id.* at 15.) The Court concluded that Plaintiffs should be allowed leave to amend if they "can adequately plead that the distributors were part of the putative conspiracy." (*Id.* at 16.)

### C.    The Second Amended Complaint

The SAC drops the GPOs and all distributors except Cardinal and McKesson as defendants. Surprisingly, given the Seventh Circuit's decision, Plaintiffs do not even attempt to allege a horizontal agreement among the distributors. Instead, they allege the opposite. Plaintiffs allege that Cardinal and McKesson allegedly entered into "*independent* vertical conspiracies" with BD to help BD monopolize the relevant markets for conventional and safety

6

syringes and safety IV catheters.  (SAC ¶ 34 (emphasis added).)  Plaintiffs disclaim the very theory they advocated to the Seventh Circuit:  a hub-and-spokes conspiracy involving a horizontal agreement between the previously named distributors.  (*See e.g.*, SAC ¶ 43 ("Cardinal and McKesson each independently agrees with Becton to enforce" anticompetitive agreements).)

The main allegations of these "independent vertical conspiracies" are the same allegations the Seventh Circuit found insufficient.  Plaintiffs repeat the same allegations regarding the distributors' agreements to distribute BD's products pursuant to the allegedly anticompetitive terms of BD's contracts with GPOs; the enforcement of BD's "penalty pricing system;" the payments to GPOs; and the promotion of BD as a "preferred brand."  (SAC ¶¶ 43–50.)

Plaintiffs do add allegations about certain ways that the distributors allegedly promoted BD products to customers.  Those alleged activities include lying to customers about the availability of competitive products and their obligations under BD contracts, and spreading false information about competitive products (SAC ¶¶ 48, 54); limiting access to competitors' sale personnel (SAC ¶ 51); "embedding" personnel in hospitals to push sales of BD products (SAC ¶ 52); and imposing requirements that customers purchase a certain percentage of their requirements from a single distributor (SAC ¶ 55).  But there is no allegation that BD had any knowledge of or participation in these alleged activities.

Plaintiffs also allege additional ways in which the distributors supposedly "enforced" the "penalty pricing system" by pressuring customers to enforce BD volume requirements and cutting off credit lines to customers who do not comply (SAC ¶ 47), and by providing BD with "valuable information," such as customer purchasing history and whether they are meeting their volume requirements (SAC ¶ 53).  But, there is not a single fact alleged to

suggest that BD colluded with McKesson or Cardinal with respect to any of this alleged distributor behavior.

In short, the SAC re-alleges the same "conspiratorial" conduct the Seventh Circuit ruled is not actionable -- and thus cannot satisfy the conspiracy exception -- and does not allege any other conduct demonstrating a conspiracy among BD and the distributors, or a conspiracy among the distributors themselves, to restrain competition. Also missing from the SAC is any allegation regarding the distributors' respective market shares in the relevant markets, without which Plaintiffs cannot meet their burden of alleging market power, thus leaving Plaintiffs with no viable antitrust claim.

## ARGUMENT

To survive a motion to dismiss, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. It is especially appropriate for a court "to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" in an antitrust case, where the costs of discovery are often "enormous." *Id.* at 558–59 (quoting *Associated Gen. Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 528  n.17 (1983)) (internal quotation marks omitted).

To plead a conspiracy in violation of Section 1 of the Sherman Act, Plaintiffs' allegations of anticompetitive conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."

*Twombly*, 550 U.S. at 557. "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 557.

In this case, without a *plausible* allegation of an actionable conspiracy between the distributors and BD, Plaintiffs lack standing to sue BD under the "conspiracy exception" to *Illinois Brick*. (Op. 15.) A Rule 12(b)(6) motion is the appropriate means for dismissing the SAC for lack of standing. *See, e.g.*, *Simon* v. *KeySpan Corp.*, 694 F.3d 196, 208 (2d Cir. 2012); *Warren Gen. Hosp.* v. *Amgen Inc.*, 643 F.3d 77, 79 (3d Cir. 2011).

Because Plaintiffs have now failed to draft an adequate complaint even with the Seventh Circuit's clear instructions, the SAC should be dismissed with prejudice. *See Gonzalez-Koeneke* v. *West*, 791 F.3d 801, 807 (7th Cir. 2015) ("District courts . . . have broad discretion to deny leave to amend . . . where the amendment would be futile."); *Airborne Beepers & Video, Inc.* v. *AT & T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007).

## I. THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD A VIABLE CONSPIRACY AND THEREFORE LACK STANDING UNDER THE "CONSPIRACY EXCEPTION" TO *ILLINOIS BRICK*

### A. Plaintiffs Have Not Alleged the Facts that the Seventh Circuit Held Were Necessary to Allege a Conspiracy and Avoid Dismissal

While the Seventh Circuit held that the lack of a price-fixing conspiracy did not dispose of the standing question, it also held that Plaintiffs' conspiracy allegations in the First Amended Complaint were insufficient to establish standing via an exception to *Illinois Brick*. It then gave Plaintiffs instructions for what they would need to allege to sue BD. The Court held

that "the plaintiffs must show that similarly situated members of the conspiracy [*i.e.*, the distributors] coordinated not only with the manufacturer, but also with each other." (Op. 12–13.) The Court of Appeals added that "[w]ithout an allegation that the distributors have participated in the conspiracy or knowingly engaged parallel anticompetitive conduct with each other," Plaintiffs lack standing (*id.* at 15) and their "case falls apart" (*id.* at 12).

The SAC does not allege what the Seventh Circuit held is necessary. With respect to a conspiracy of the distributors "with each other," the SAC negates that required allegation by claiming that Cardinal and McKesson acted "independent" of each other. Abandoning the horizontal "hub-and-spokes" theory, and switching to a purely vertical conspiracy theory, makes the new complaint more infirm than the prior complaint from a standing perspective.

The Seventh Circuit already held that the vertical distribution arrangements between BD and Cardinal, and between BD and McKesson, alleged in the prior complaint were insufficient to support an actionable conspiracy, and therefore insufficient to establish the conspiracy exception to *Illinois Brick*. As discussed in Parts I.B and I.C below, Plaintiffs have not added new factual allegations that would push their claim of a vertical conspiracy between BD and either distributor defendant "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The Seventh Circuit's focus on the horizontal agreement allegations of Plaintiffs' original conspiracy theory was not and is not academic. Without such allegations, all that Plaintiffs have described is ordinary, independent economic activity in a vertical distribution chain -- *i.e.*, distributors buying and selling the manufacturer's products "in accordance with the terms of the contracts that the GPOs have negotiated." (*Id.* at 15.) That is insufficient, the

Seventh Circuit held, to find *any* conspiracy in violation of the antitrust laws, including "a [vertical] conspiracy between the distributors and Becton."  (*Id.* at 14.)  On the contrary, the Seventh Circuit observed that the fees paid by the distributors to the GPOs for negotiating contracts with BD are "to be expected."  (*Id.* at 15.)  As the Supreme Court has explained, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway."  *Twombly*, 550 U.S. at 566.

Plaintiffs themselves allege that "enforcing long-term exclusive-dealing schemes like the ones Becton has perpetrated puts [the two defendant] Distributors at risk of losing profits and market share to other distributors who are willing to give their customers more freedom to choose non-Becton Products."  (SAC ¶ 61.)  That allegation does not help Plaintiffs.  It only highlights what is missing from the complaint.  If, as Plaintiffs allege, it would be economically irrational for each of Cardinal and McKesson to independently agree to enforce BD's "long-term exclusive-dealing schemes," then what is required to make Plaintiffs' claim plausible is a horizontal conspiracy among the distributors.  Absent a horizontal conspiracy among all (or most) distributors, any distributor (such as McKesson or Cardinal) independently entering into a vertical conspiracy with BD would risk "losing profits and market share" to other distributors.

Alleging that McKesson and Cardinal entered into separate and "independent" conspiracies, and thus disclaiming any horizontal conspiracy with each other and the other distributors, can mean only one of two things: One, they are admitting that the alleged independent vertical conspiracies with BD are implausible, because no distributor would agree independently to something that would cause it to lose sales to its rivals; or two, they are acknowledging that the distributors' alleged conduct was entirely rational and consistent with their own independent self-interests -- in other words, not conspiratorial at all.  *See Twombly*,

550 U.S. at 554. In either case, Plaintiffs have failed to allege a cognizable conspiracy claim. As the Seventh Circuit already ruled, absent allegations of horizontal coordination, Plaintiffs' allegations are "insufficient to find a conspiracy between the distributors and Becton." (Op. 14.)

**B.    Plaintiffs' Vertical Conspiracy Allegations Were Already Considered and Rejected as Insufficient By the Seventh Circuit**

The central allegations of independent vertical conspiracies between BD and each of Cardinal and McKesson in the new complaint already were examined by the Seventh Circuit and found to be insufficient. That Cardinal and McKesson allegedly take part in "enforcing" the allegedly anticompetitive contracts, BD negotiated with the GPOs (Plaintiffs' negotiating agents), and that BD pays them for doing so, does not suffice to sustain a vertical conspiracy claim and, thus, does not suffice to establish the conspiracy exception to *Illinois Brick*.

Specifically, the Seventh Circuit held that *none* of the following allegations gives rise to an inference of conspiracy of any kind, vertical or horizontal: the distributors agreeing to distribute BD products pursuant to the GPO contract terms (Op. 14); the distributors enforcing BD's "penalty pricing system" (*id.* at 14–15); and the distributors making payments to the GPOs based on the volume of sales under the contracts (*id.* at 15). Those allegations were made in the prior complaint, were rejected as inadequate, and are made again in the SAC.

The Seventh Circuit found that the fact that distributors pay a fee to GPOs, "is not anticompetitive conduct on its own; indeed, it is to be expected." (*Id.* at 15.) It also made no difference to the Seventh Circuit that Plaintiffs alleged (before, as they do now) that "Becton pays distributors for selling more of its products, and in return, the distributors agree to promote Becton products above the products of competitors." (*Id.* at 4.) The Court held that none of those agreements or actions -- on its own or in combination with the others -- was sufficient "to

find a conspiracy between the distributors and Becton," or to find that the distributors "coordinated their actions to engage in illegal activity."  (*Id.* at 14.)

The primary allegations in the SAC of the supposed "Becton-Distributor Conspiracies" (SAC ¶¶ 43–61), just repeat what the Seventh Circuit held was not enough:  the distributors "enforce" BD's contracts with the GPOs, including all of the alleged anticompetitive provisions; pay the GPOs for them; and are paid themselves for their services.  (SAC ¶¶ 43–45.) This Court need not revisit these allegations.  The Seventh Circuit already held they are legally insufficient:

> The Providers allege only that the distributors 'enforce' the terms of the contracts that the GPOs negotiated and then assess the Providers an additional fee for the distributors' services.  The complaint has nothing to say about any involvement that the distributors may have in inflating the prices, or whether they coordinate among each other or with Becton or the GPOs as part of the conspiracy.

> The Providers ask us instead to find that the distributors are members of the conspiracy because they buy and sell the devices according to the terms of contracts that the GPOs allegedly negotiated in a crooked fashion.  But this allegation is insufficient to find a conspiracy between the distributors and Becton.

(Op. 13–14).

Since Plaintiffs' new vertical conspiracy allegations are substantively the same as the ones the Seventh Circuit rejected, Plaintiffs still have failed to plead the existence of an actionable conspiracy between the distributors and BD.  Accordingly, their case remains "barred under *Illinois Brick*."  (*Id.* at 15.)

**C.    Plaintiffs' Seemingly New Allegations Are Insufficient to Demonstrate the Existence of Two Separate and Independent Vertical Conspiracies**

In order to allege a vertical conspiracy complying with *Twombly*, Plaintiffs would have to allege facts *plausibly* showing that each of the distributors "had a conscious commitment" itself to joining an anticompetitive scheme with BD.  (Op. 12 (citing *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)); *see Twombly*, 550 U.S. at 557.  This point is crucial:  to

13

survive dismissal, these vertical conspiracy allegations must tend to exclude the possibility that the distributors' actions were undertaken unilaterally rather than pursuant to a conspiratorial agreement with BD. *In re Dealer Mgmt. Sys. Antitrust Litig*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018) ("Mere allegations of 'parallel conduct,' without more, do not 'tend[] to exclude the possibility of independent action,' and are therefore insufficient." (citation omitted)).

Thus, Plaintiffs' burden on remand was to plead some new facts that would fill the void the Seventh Circuit found in the prior complaint, and would demonstrate that each of the distributors consciously committed to joining an anticompetitive conspiracy with BD -- not merely that "they buy and sell the devices according to the terms of contracts that the GPOs allegedly negotiated in a crooked fashion." (*Id.* at 13–14.) Plaintiffs have failed to carry that pleading burden.

What might look like new allegations are just different ways of describing the same conduct that the Seventh Circuit held does not amount to an actionable conspiracy. These include allegations that the distributors pressured customers to enforce BD volume requirements and cut off credit lines to customers who do not comply (SAC ¶ 47); provided BD with "valuable information," such as customer purchasing history and whether they are meeting their volume requirements (SAC ¶ 53); and monitored their own employees to make sure they are enforcing BD's exclusive dealing terms (SAC ¶ 57). But, as the Seventh Circuit held, allegations that "the distributors enforce Becton's penalty pricing system, which penalizes the healthcare providers if they switch to a different manufacturer," (Op. 14–15), do not suffice.

They also include allegations that the distributors "lied to providers to dissuade them from buying non-Becton Products" (SAC ¶ 48); required customers to purchase a certain percentage of their requirements from a single distributor (SAC ¶ 55); and "embedded"

14

employees in hospitals (SAC ¶ 52).  What is striking about these allegations is that Plaintiffs do *not* allege any conduct or involvement by BD.  All that is alleged is conduct by the distributors to persuade their customers to buy more from them and buy BD products.[1]  Thus, those allegations add nothing to Plaintiffs' attempt to show collusion between the distributors and BD.

During oral argument in this Court on BD's previous motion to dismiss, Plaintiffs' counsel made virtually the same allegations:

> And, indeed, the distributors are also taking the same schemes outside of the contract to also further Becton's restraint of trade.  They are also each agreeing to say allow Becton to pay their distributors' employees bonuses, which in a way allows Becton to monitor the distributors' compliance with the conspiracy by giving them direct access to their employees.  And they're both all -- in fact, they're all helping Becton by also emphasizing Becton in their advertising to the exclusion of other competitors.

(Oct. 17, 2018 Hr'g Tr. at 71:15–72:1, ECF No. 116.)  The Seventh Circuit had that record before it, and found such allegations -- all of which relate to "enforcement" of BD's allegedly anticompetitive contracts with GPOs and/or "promotion" of BD's products -- to be insufficient as a matter of law.  (Op. 13–15.)

Even accepting the SAC's allegations as true, all that they show is that Cardinal and McKesson found it more profitable to sell BD products than to sell competitors' products.  That is entirely consistent with rational, non-conspiratorial economic behavior and, therefore, does not give rise to any plausible inference of a conspiracy.  *Twombly*, 550 U.S. at 554.  After all, Plaintiffs already alleged in their prior complaint that "Becton pays the distributors for

---

[1] Plaintiffs' allegation that "Distributor sales personnel" used a BD "'cost calculator' to falsely argue to providers that Becton's Products would save money" (SAC ¶ 54) is no different.  Plaintiffs fail to allege any facts suggesting that BD conspired with Cardinal or McKesson to distribute the allegedly false information.  Moreover, the Fifth Circuit Court of Appeals has already held, as a matter of law, that the same false advertising that Plaintiffs allege here is not "cognizable" as an antitrust violation.  *Retractable Techs., Inc.* v. *Becton, Dickinson & Co.*, 842 F.3d 883, 897 (5th Cir. 2016); *see also Mercatus Grp., LLC* v. *Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011) (holding that false advertising "statements are outside the reach of the antitrust laws, however critical they may be of a competitor's product").

selling more of its products, and in return, the distributors agree to promote Becton products above the products of competitors," and the Seventh Circuit found that allegation insufficient to allege a conspiracy. (Op. 4.) The additional allegation that distributors' sales employees sometimes lied to their customers in promoting BD products, for example, does nothing to save the conspiracy claim. Even accepting it as true, it is merely another instance of the distributors acting in their own *unilateral* self-interest to increase their own sales and profits.

The same applies to Plaintiffs' allegation that the distributors benefit directly when BD raises its prices under contracts with the GPOs. (SAC ¶ 60.) First, all Plaintiffs have done is to re-word a substantively identical allegation from the prior complaint that the Seventh Circuit found inadequate. (*See* AC ¶ 57 (alleging that "the fees these distributors receive on their sales are computed based on Becton's above-competitive pricing"; therefore "distributors are rewarded when Becton prices are higher").) And, second, these alleged benefits to the distributors do not give rise to an inference of conspiracy. As the Seventh Circuit explained, the fact that distributors "buy and sell the devices according to the terms of contracts that the GPOs allegedly negotiated in a crooked fashion . . . is insufficient to find a conspiracy between the distributors and Becton." (Op. 13–14.)

By highlighting the fact that the distributors benefited from buying and selling BD's products under those contracts, Plaintiffs have only confirmed that doing so was in each distributor's *unilateral* self-interest. *See Temple* v. *Circuit City Stores, Inc.*, 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) (alleged vertical conspiracy insufficient under *Twombly* where downstream firm's decision to accept upstream firm's anticompetitive pricing and pass on overcharges to its own customers was just as consistent with independent economic self-interest

of downstream firm as with downstream firm conspiring with upstream firm); *Bennett* v. *Wal-Mart Stores, Inc.*, 2011 WL 3878330 (E.D.N.Y. Sept. 2, 2011) (same).

Accordingly, Plaintiffs have failed to allege an actionable conspiracy and, as a result, are barred under *Twombly* and *Illinois Brick* from pursuing their claims against BD.

## II. THE COMPLAINT ALSO SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE THAT EITHER MCKESSON OR CARDINAL HAS THE REQUIRED MARKET POWER

Plaintiffs' complaint should be dismissed for an additional reason: they have failed to allege any facts showing that McKesson and Cardinal each possess market power in the relevant markets for conventional syringes, safety syringes, and safety IV catheters. Without such allegations, Plaintiffs have not alleged a viable antitrust claim.

Unlike horizontal price-fixing agreements, which are *per se* illegal, all vertical agreements are judged under the "rule of reason." *Leegin Creative Leather Prod., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 907 (2007). This rule requires, among other things, a showing of market power in a properly defined relevant market. *Ball Mem. Hosp., Inc.* v. *Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334–36 (7th Cir. 1986) ("Market power is a necessary ingredient in every case under the Rule of Reason."); *Ohio* v. *Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (rule of reason requires "a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition") (alteration in original) (citation omitted).

To support their claims of independent vertical conspiracies, Plaintiffs were required to allege not only that BD had market power, but also that each of Cardinal and McKesson had market power. As discussed below, Plaintiffs have failed to make such allegations. That failure underscores the absence of sufficient allegations of any vertical conspiracy. If a distributor does not have market power, then by agreeing with a manufacturer *independently* to enforce the manufacturer's allegedly inflated contract prices, it risks losing

business to other distributors, as Plaintiffs assert in paragraph 61 of the SAC. Since Plaintiffs now allege that Cardinal and McKesson did *not* conspire with each other, the only way it would make economic sense for one of them to agree with BD to charge inflated prices, is if that distributor faced no competition from other distributors. Absent market power, or a horizontal conspiracy, it is not plausible that a distributor would expose itself to losing business by entering into an independent vertical conspiracy with BD. *See Twombly*, 550 U.S. at 556–557.

Relatedly, because all vertical restraints are analyzed under the rule of reason, market power at the downstream level (here, the level where the distributors operate) is a necessary element. As the Supreme Court explained in *Leegin*, vertical restraints "may not be a serious concern unless the relevant entity has market power," and the market power of both the upstream firm and of the downstream firm are relevant to this analysis. *Leegin*, 551 U.S. at 898. The Seventh Circuit recently reaffirmed the same principle: "When assessing exclusionary conduct, it is 'necessary to examine market power or share at *both* of the two market levels involved.'" *Viamedia, Inc.* v. *Comcast Corp.*, 951 F.3d 429, 452 (7th Cir. 2020) (citation omitted); *see also Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002) ("Without having alleged Compaq's or Dell's power or share in the PC market, Gravity is unable to demonstrate that rival software firms' access to Compaq or Dell was an important component of those firms' potential ability to compete in the software markets, or that Microsoft's agreements with Compaq and Dell substantially hindered the entrance or operation of these rivals in the software markets or denied them access to a significant number of consumers of software.").[2]

---

[2] Plaintiffs' counsel previously argued that this Court should decline to follow *Dickson* because it is ostensibly in conflict with the Seventh Circuit's decision in *Toys 'R' Us* and Supreme Court precedent on proof of agreement under Section 1 of the Sherman Act. (Oct. 17, 2018 Hr'g Tr. at 71:15–72:1, ECF No. 116.) The Seventh Circuit has now made clear that the allegations Plaintiffs argued were sufficient under *Toys 'R' Us* were in fact *insufficient*. Further, district courts in the Seventh Circuit have repeatedly cited *Dickson* favorably. *See City of Rockford* v. *Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019); *Mr. Dee's Inc.* v. *Inmar, Inc.*, 2019 WL 1380337, at *5 (E.D. Wis. 2019); *Hannah's Boutique, Inc.* v. *Surdej*, 112 F. Supp. 3d 758, 771 (N.D. Ill. 2015).

Allegations about the upstream firm's market power do not negate the necessity of alleging facts showing the downstream firms' market power as well. *See Dickson*, 309 F.3d at 208.

The closest Plaintiffs come to an allegation that Cardinal and McKesson possess market power is paragraph 26, in which they allege that "Cardinal and McKesson also control a massive share of the distribution of medical devices and supplies." (SAC ¶ 26.) That assertion does not suffice to allege market power for multiple reasons:

<u>First</u>, it lumps together McKesson and Cardinal, even though they are not alleged to be in a conspiracy with each other and, by Plaintiffs' own admission, are "independent" economic actors. What Plaintiffs were required to allege in order to plead separate, independent vertical conspiracies, was that McKesson and Cardinal *each*, on its own, had market power in the relevant market. Plaintiffs have not even tried to do that. *See Dickson*, 309 F.3d 210 (holding, in the context of a claim of separate vertical conspiracies between Microsoft and OEMs, that allegations regarding the OEMs' aggregate market power were legally insufficient); *see also In re Pool Prodts. Distrib. Mkt. Antitrust Litig.*, 2016 WL 1722090, *4 (E.D. La. April 29, 2016) ("[T]he legal standard applicable to a vertical conspiracy claim . . . tasks the Court with separately considering the competitive effect of each alleged conspiracy, rather than the aggregate effect of all allegedly unlawful conduct. . . ." ). Indeed, as distributors explain in their separate brief, Plaintiffs do not even allege that they purchased from Cardinal, and therefore cannot sue BD for its alleged vertical agreement with Cardinal. Nor could they aggregate Cardinal and McKesson's market shares for purposes of alleging market power.

<u>Second</u>, the vague allegation of a "massive" share, collectively held by multiple parties, is no substitute for allegations of *each* party's market shares. "To evaluate a defendant's market power, 'at the very least it must be shown how much of the relevant market a

defendant controls.'"  *Ervin Equip. Inc.* v. *Wabash Nat'l Corp.*, 2017 WL 416304, at *4 (N.D. Ind. Jan. 31, 2017) (dismissing complaint for failure to allege facts showing defendants' market shares) (citation omitted).  This current allegation is particularly suspect in light of the fact that, in their prior Amended Complaint, Plaintiffs alleged that four defendants -- "Cardinal, Owens & Minor, McKesson, and Henry Schein also control a massive share of the distribution of medical devices and supplies."  (AC ¶ 35.)  Plaintiffs' current pleading also discloses the existence of other distributors of BD products.  (SAC ¶ 26 (referring to "other Becton distributors").)  By definition, whatever share Cardinal and McKesson control alone or together, it must be less "massive" than the share controlled by the four distributors and others in the market.  And the share that Cardinal and McKesson *each* control individually must be even less "massive" still.

Third, regardless of what Plaintiffs mean by "massive," they have not alleged which distributor has what shares in which relevant market.  All they allege is some amalgam of multiple, unspecified, markets they call "distribution of medical devices and supplies."  The SAC does not contain a single allegation about market shares in any one of the three relevant markets pled by Plaintiffs:  conventional syringes, safety syringes, and safety IV catheters.  An allegation of market power must be made with reference to the particular relevant market; otherwise, it is meaningless for purposes of an antitrust claim.  *See Am. Express Co.*, 138 S. Ct. at 2285 n.7.

By alleging facts only as to BD's market power, and not Cardinal's and McKesson's, Plaintiffs fail to state an actionable claim of vertical conspiracy under Section 1 of the Sherman Act, and thus -- as discussed above -- fail to establish standing under the conspiracy exception to *Illinois Brick*.  Accordingly, the failure to allege market power is an additional reason to dismiss the SAC.

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

BRYAN, CAVE, LEIGHTON, PAISNER

/s/*Richard P. Cassetta*
Richard P. Cassetta
Richard.cassetta@bclplaw.com
Stefani L. Wittenauer
Stefani.wittenauer@bclplaw.com
211 N Broadway #3600,
St. Louis, MO 63102
(314) 259-2823
Fax: (314) 259-8823

PAUL, WEISS, RIFKIND WHARTON
    & GARRISON LLP

Robert A. Atkins*
Jacqueline P. Rubin*
William B. Michael*
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
*Admitted pro hac vice

*Attorneys for Becton, Dickinson
and Company*

Date: November 6, 2020

**CERTIFICATE OF SERVICE**

I certify that on November 6, 2020, I electronically filed the foregoing Defendant Becton, Dickinson and Company's Motion to Dismiss and Memorandum of Law in Support Thereof with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/ *Richard P. Cassetta*
Richard P. Cassetta