**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MARION DIAGNOSTIC CENTER, LLC; and MARION HEALTHCARE, LLC, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:18-CV-01059-NJR-RJD |
| v. | ) ) ) | |
| BECTON, DICKINSON, AND COMPANY; CARDINAL HEALTH, INC.; and MCKESSON MEDICAL-SURGICAL INC., | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |


**THE DISTRIBUTOR DEFENDANTS'**
**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..............................................................................................................3

A.    The Markets For The Relevant Products. ...............................................................3

B.    Initial Motions To Dismiss. ...................................................................................4

C.    Seventh Circuit Appeal. .........................................................................................5

D.    Second Amended Complaint. .................................................................................6

ARGUMENT ...................................................................................................................7

I.      PLAINTIFFS LACK STANDING TO SUE CARDINAL. ......................................7

    A.    Plaintiffs Allege Facts Proving They Lack Article III Standing To Sue
         Cardinal......................................................................................................7

    B.    Plaintiffs Cannot Establish Article III Standing By Piggy-Backing On The
         Hypothetical Claims Of Unnamed Putative Class Members.......................9

II.    THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE A PLAUSIBLE
      VERTICAL CONSPIRACY TO UNREASONABLY RESTRAIN TRADE. .................10

    A.    Plaintiffs' Vertical Conspiracy Allegations Do Not Allege the Required
         Element of Market Power or That Either Alleged Conspiracy Itself
         Restrained Trade. .....................................................................................10

         1.    Plaintiffs Fail to Plead Each Defendant Individually Has Market Power. ..........10

         2.    Plaintiffs Cannot Aggregate BD's, Cardinal's, and McKesson's Market
             Shares to Allege the Vertical Conspiracies Unreasonably Restrained
             Trade.......................................................................................................13

    B.    Plaintiffs Also Fail to Allege Conduct Supporting an Inference of Conspiracy
         Between Either BD and Cardinal, or Between BD and McKesson...........................14

         1.    The Seventh Circuit Rejected Antitrust Claims Against Cardinal and
             McKesson Based on the BD-GPO Contracts. ...........................................15

         2.    Plaintiffs' New Allegations That Distributors Engaged in Improper
             Business Conduct Do Not State an Antitrust Violation. ...........................15

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)............................................................................................12

*Ball Mem'l Hosp., Inc. v Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ..........................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................19

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) ........................................................................10

*Continental T. V., Inc. v. GTE Sylvania Inc.*,
  433 U. S. 36 (1977)......................................................................................10, 13

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ...............................................9, 10, 11, 13, 14

*Glynn-Brunswick Hosp. Auth. v. Becton*,
  159 F. Supp. 3d 1361 (S.D. Ga. 2016)...............................................................2

*Havoco of Am, Ltd. v. Shell Oil Co.*,
  626 F.2d 549 (7th Cir. 1980) ............................................................................18

*Jackson v. Resolution GGF Oy*,
  136 F.3d 1130 (7th Cir. 1998) ............................................................................8

*Jett v. Warrantech Corp.*
  436 F. Supp. 3d 1170 (S.D. Ill. 2020).............................................................7, 8

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ..........................................................................19

*Landmann v. Bann-Cor*,
  2003 WL 23742558 (S.D. Ill. Feb. 10, 2003) ...................................................9

*Landmann v. Bann-Cor*,
  2004 WL 1944789 (S.D. Ill July 16, 2004) ......................................................9

*Mar Food Corp. v. Doane*,
  405 F. Supp. 730 (N.D. Ill. 1975) ....................................................................18

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ............1, 2, 5, 6, 15, 18

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ...........17

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ...........9

*Payton v. Cnty. of Kane*,
  308 F.3d 673 (7th Cir. 2002) ...........9

*In re Pool Prods. Distribution Mkt Antitrust Litig.*,
  166 F. Supp. 3d 654 (E.D. La. 2016) ...........14

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...........7

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016) ...........17, 18

*Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*,
  863 F. Supp. 2d 732 (N.D. Ill. 2012) ...........8

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...........7

*Valley Liquors, Inc. v. Renfield Importers, Ltd*,
  822 F.2d 656 (7th Cir. 1987) ...........10, 11

*Weit v. Continental Ill. Nat'l Bank & Trust Co. of Chi.*,
  641 F.2d 457 (7th Cir. 1981) ...........8, 13

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...........16

*42nd Parallel N. v. E St. Denim Co.*,
  286 F.3d 401 (7th Cir. 2002) ...........11, 13

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ...........1

Frank H. Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53
  ANTITRUST L.J. 135 (1984) ...........10

Defendants Cardinal Health, Inc. ("Cardinal") and McKesson Medical-Surgical, Inc. ("McKesson") respectfully move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended Class Action Complaint ("SAC") (Dkt. 150) filed by Plaintiffs Marion Diagnostic Center, LLC and Marion Healthcare, LLC ("Plaintiffs"), and submit this memorandum of law in support of motion.

## PRELIMINARY STATEMENT

After years of failed efforts, Plaintiffs still cannot allege a viable antitrust violation involving their purchase of Becton Dickinson and Company ("BD" or "Becton") syringes, safety syringes, and safety IV catheters ("Products") at purportedly inflated, supracompetitive prices. Plaintiffs have tried *three times* in this Court alone to allege a conspiracy to restrain trade between BD and distributors to sell BD Products to Plaintiffs and the putative classes they seek to represent. Their latest effort—the SAC—attempts to allege two separate vertical conspiracies (one between BD and Cardinal,[1] and one between BD and defendant McKesson). The SAC is no more viable than any of Plaintiffs' prior iterations.

The SAC fails for multiple reasons. *First*, because Plaintiffs did not purchase any Product from Cardinal, they lack Article III standing to sue Cardinal. *Second*, to state a viable claim of a vertical conspiracy to restrain trade, Plaintiffs must allege that each participant in each alleged vertical conspiracy has market power. Plaintiffs did not and cannot do so, because the four distributors Plaintiffs originally sued are now all alleged to be competitors of one another. *Third*, Plaintiffs largely re-allege the same facts the Seventh Circuit already found insufficient to establish a conspiracy to restrain trade, *see Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d

---

[1] Cardinal notes that Plaintiffs have erroneously named Cardinal Health, Inc. The distribution entity relevant to Cardinal's purchases of Products is Cardinal Health 200, LLC.

832, 837, 842–43 (7th Cir. 2020), and the new allegations Plaintiffs tack on to the SAC cannot save their claims because they allege (if anything) business torts, not antitrust violations.

These failings are fatal, as the Seventh Circuit made abundantly clear: "If the distributors were not part of the alleged conspiracy, then Providers' case falls apart: no conspiracy, no direct purchaser status, no right to recover." *Marion*, 952 F.3d at 841.

Plaintiffs have had numerous opportunities to allege a viable claim. The first try was a suit brought by the same counsel on behalf of a different plaintiff alleging BD violated the antitrust laws in passing supracompetitive prices on to purchasers through cost-plus contracts with distributors. As here, plaintiffs alleged BD used so-called "exclusionary schemes" to maintain its market power: rebates, bundling, penalty provisions, sole-source provisions, technology theft, deceptive advertising, and acquiring rivals to eliminate competition. The court dismissed the case because plaintiffs failed to allege a plausible antitrust claim. *Glynn-Brunswick Hosp. Auth. v. Becton*, 159 F. Supp. 3d 1361 (S.D. Ga. 2016).

Plaintiffs then tried this Court, alleging in an amended complaint that BD, Cardinal, McKesson, two other distributors, and two "group purchasing organizations" or "GPOs" were engaged in a horizontal "hub and spoke" conspiracy. The Seventh Circuit rejected that alleged conspiracy for failing to allege a plausible antitrust claim. *Marion*, 952 F.3d at 842–43.

Plaintiffs now abandon their hub and spoke theory along with claims against many market participants they previously asserted were co-conspirators, and instead allege two separate vertical conspiracies. But, as shown below, these latest conspiracy claims are just as legally deficient as the last claims. Plaintiffs' counsel has been trying for years to contrive some conspiracy theory involving BD and others to inflate the prices of Products they purchased. They have failed at every step. Despite taking nearly six months to craft a new complaint after the Seventh Circuit's

rejection of their last conspiracy claim, and knowing from the start that they lack standing to pursue claims against Cardinal, Plaintiffs again filed a complaint that is deficient as a matter of law. The time has come to end this case. The Court should now dismiss this case *with prejudice*.

## BACKGROUND

### A.  The Markets For The Relevant Products.

This case concerns the sale of syringes, safety syringes, and safety IV catheters in the United States. SAC ¶ 1. BD is a manufacturer of these Products. Cardinal and McKesson distribute medical supplies, including the Products, to healthcare providers like Plaintiffs, but they are not involved in setting the prices of BD Products. Plaintiffs participate with other providers in GPOs that negotiate with BD on behalf of their members and agree to terms and conditions, including prices, at which BD will sell and Plaintiffs will purchase BD Products. *Id*. ¶¶ 2, 22–23. Each provider may (but is not required to) purchase medical products pursuant to the terms negotiated by its GPO from a distributor authorized to sell the manufacturer's goods. *Id*. ¶ 23. Whatever complaints Plaintiffs may have against the GPOs for the contracts with BD are no longer at issue because Plaintiffs have dropped the GPOs from the case.

Cardinal and McKesson play no role in negotiating the prices, volumes, terms, or rebates for BD Products. When a provider (such as a Plaintiff) wants to purchase BD Products, it contacts a distributor authorized to sell BD Products that resells the Products to providers at the prices and terms the providers negotiated on their own or through their GPOs (at the provider's election). *Id*. ¶ 2. Cardinal and McKesson—like distributors generally—charge a "percentage markup" on the products sold to account for the services they each provide. *Id*. ¶ 23. They keep track of purchases to ensure providers that meet the volume targets get their contracted-for rebates, and pay the correct price. They also pay "administrative fees" to the providers' GPOs based on the volume of BD purchases made by the providers under their respective GPO contracts. *Id*. ¶¶ 22–

23, 44–46, 53. BD sometimes negotiates for distributors to promote its Products "as the preferred brand" and rewards distributor salespeople with "bonuses." *Id.* ¶¶ 49–51, 59.

In addition to Cardinal and McKesson, Plaintiffs acknowledge that there are "other distributors" (not alleged to have conspired with BD) "who are willing to give their customers more freedom to choose non-Becton Products," and to which each of Cardinal and McKesson is "at risk of losing profits and market share." *Id.* ¶ 61. In the Amended Class Action Complaint ("FAC") (Dkt. 52), Plaintiffs identified two other major distributors of BD Products: Owens & Minor ("O&M") and Henry Schein Inc. ("Schein"). Plaintiffs averred that O&M was "one of the largest distributors of Becton conventional syringes, safety syringes, and safety IV catheters in the United States," FAC ¶ 15, and that O&M, Schein, Cardinal, and McKesson collectively controlled the "massive share" of the (irrelevant) medical devices and supplies distribution market that Plaintiffs now claim is controlled solely by Cardinal and McKesson. *Compare id.* ¶ 35, *with* SAC ¶ 26. Plaintiffs now allege that O&M and Schein are not co-conspirators after all, but competitors to Cardinal and McKesson. *See* SAC ¶ 26. Plaintiffs likewise have abandoned any claim that Cardinal and McKesson conspired with one another. Each is alleged to have conspired only with BD. *See* SAC ¶¶ 23, 34, 43, 97, 102, 109.

**B.    Initial Motions To Dismiss.**

In the FAC, Plaintiffs alleged a "hub and spoke" conspiracy between BD, two GPOs, and four distributors (including Cardinal and McKesson). All defendants moved to dismiss the FAC. Granting BD's motion, this Court found Plaintiffs could not sue because the antitrust laws limit damage claims to those plaintiffs that purchased directly from the alleged wrongdoer. *See* Dkt. 117. Distributors Cardinal and McKesson, joined by then co-defendants O&M and Schein, had argued the FAC did not state a claim for a conspiracy to restrain trade. Dkt. 85. This Court did not reach the issues argued in the distributors' motion.

4

**C.      Seventh Circuit Appeal.**

On appeal, the Seventh Circuit found the "conspiracy exception" to *Illinois Brick* permitted Plaintiffs to sue. *Marion*, 952 F.3d at 841. It stated that where Plaintiffs bought indirectly from BD, they could nevertheless sue if they purchased from a BD co-conspirator. The Seventh Circuit noted that because "the distributors are the entities from which the Providers purchased the products at issue," the case falls apart "[i]f the distributors were not part of the alleged conspiracy." *Id.* If there is "no conspiracy," there is "no direct purchaser status, [and] no right to recover." *Id*.

The Seventh Circuit agreed with distributors that Plaintiffs had failed to allege a plausible antitrust conspiracy. *First,* the Seventh Circuit held that the distributors could not be liable for actions related to Product pricing: that distributors "buy and sell the [Products] according to the terms of contracts that . . . GPOs allegedly negotiated in a crooked fashion [with Becton] . . . is insufficient to find a conspiracy between the distributors and Becton." *See id*. at 842. The Court held that the distributors do not violate the antitrust laws by charging a price negotiated by Plaintiffs' agents and BD. *Second,* the Court found that the distributors' other alleged actions, such as applying volume discounts or rewarding customers for continued loyalty, were not antitrust violations. "[T]aken alone or together," the Court held these claims "do not suffice" to establish the participation of distributors like Cardinal and McKesson in a conspiracy with BD to restrain trade. *Id.* at 843. *Third*, the Court found that Plaintiffs' complaint failed to allege a hub and spoke conspiracy among the defendants, as it did not allege any horizontal agreement between the distributors to participate in the conspiracy. It then remanded the case to this Court and permitted Plaintiffs to re-plead a claim, consistent with their Rule 11 obligations, if "they believe they can adequately plead that the distributors were part of the putative [hub and spoke] conspiracy." *Id.*

**D. Second Amended Complaint.**

Plaintiffs now offer a wholly different conspiracy theory. They allege two supposed separate, vertical conspiracies between: (1) BD and Cardinal (Count I); and (2) BD and McKesson (Count II). SAC ¶¶ 70–72. Cardinal and McKesson still have nothing to do with setting the prices Plaintiffs pay for BD Products: Plaintiffs continue to allege the prices they pay are set in negotiations between BD and Plaintiffs, or between BD and Plaintiffs' GPO. *See id.* ¶¶ 23, 35.

Plaintiffs' vertical conspiracy allegations, however, arise in a distribution market in which Plaintiffs concede that Cardinal and McKesson have competitors, including each other. *Compare id.* ¶¶ 23, 34, 43, 97, 102, 109 (alleging "independent" vertical conspiracies between BD and each of Cardinal and McKesson), *with* FAC ¶ 89. *See also Marion*, 952 F.3d at 842 (Plaintiffs "allege that Becton and the distributors were members of a 'hub-and-spokes conspiracy'"). Plaintiffs acknowledge that other companies like Schein and O&M are authorized distributors of BD Products; indeed, O&M is "one of the largest." FAC ¶¶ 15, 17. These distributors are *not* alleged to have conspired with BD, or with Cardinal or McKesson; instead, Plaintiffs acknowledge they are alternative competing distributors to which providers like Plaintiffs can turn. SAC ¶ 61.

Plaintiffs continue to rely on allegations the Seventh Circuit found "insufficient" to find an unlawful conspiracy to restrain trade between the distributors and Becton." *Marion*, 952 F.3d at 842. The Seventh Circuit found distributors have *no* involvement in the pricing of Products and buy and sell Products and engage in other distribution activities consistent with the terms of the BD-GPO contracts, including providing incentives to purchase BD Products. *Id.*; *see also* SAC ¶¶ 45–47. Plaintiffs allege new activities in addition to those the Seventh Circuit already found insufficient, *see* SAC ¶¶ 48–57; *see also* Section II.B.2, *infra*, but those new assertions, as explained below, fail to allege antitrust violations.

**ARGUMENT**

The SAC should be dismissed on two grounds. *First*, Plaintiffs allege they purchased BD Products only from McKesson, and *not* Cardinal. SAC ¶¶ 8–9. As such, Plaintiffs lack constitutional standing to sue Cardinal in Count I because the injury they claim (paying supracompetitive prices for Products, *e.g.*, *id.* ¶ 7) is not "fairly traceable" to any conduct by Cardinal. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). *Second*, both vertical conspiracy claims are defective for two reasons, each of which is an independently sufficient basis for dismissal. To state a vertical conspiracy claim, Plaintiffs must plead: (1) market power for *each* party to *each* alleged conspiracy, and that (2) each conspiracy—independently—unreasonably restrained trade. Plaintiffs do neither.

**I.     PLAINTIFFS LACK STANDING TO SUE CARDINAL.**

**A.   Plaintiffs Allege Facts Proving They Lack Article III Standing To Sue Cardinal.**

Plaintiffs allege no purchases from Cardinal, and therefore lack standing to sue Cardinal. Standing to sue is rooted in the understanding of "cases" and "controversies" that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 136 S. Ct. at 1547. As the Supreme Court has explained: "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation [in Article III] of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To survive a motion to dismiss, "a plaintiff must 'clearly allege facts demonstrating each element' required to establish she has standing." *Jett v. Warrantech Corp.* 436 F. Supp. 3d 1170, 1175 (S.D. Ill. 2020) (quoting *Spokeo*, 136 S. Ct at 1547).

Plaintiffs' allegations preclude standing to sue Cardinal. The "'irreducible constitutional minimum' of standing requires" that the SAC show "that a plaintiff has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to

be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo*, 136 S. Ct. at 1547). It is a "fundamental requirement . . . that plaintiffs establish a sufficient nexus between the defendant's alleged actions and an injury to plaintiffs," and that they do so "at the time the complaint is filed." *Weit v. Continental Ill. Nat'l Bank & Tr. Co. of Chi.*, 641 F.2d 457, 469 (7th Cir. 1981). Absent such a nexus, there is no "case or controversy" between the parties, and dismissal is required. *Jackson v. Resolution GGF Oy*, 136 F.3d 1130, 1132 (7th Cir. 1998) (dismissing claims against Norwest for lack of standing, and chiding district court for failing to give "priority consideration" to Norwest's motion raising the "jurisdictional issue" of whether named plaintiffs had standing to sue Norwest, given that Norwest held none of the notes signed by named plaintiffs).

Plaintiffs acknowledge they purchased no Products from Cardinal. SAC ¶¶ 8–9. Thus, no injury Plaintiffs complain about—paying supracompetitive prices for the Products they purchased from McKesson—can be traced to anything Cardinal did as part of the alleged independent vertical conspiracy between it and BD. *Id.* ¶¶ 23, 34, 43, 97, 102.[2] Plaintiffs therefore lack standing to sue Cardinal. *See, e.g.*, *Jett*, 436 F. Supp. 3d at 1177 (granting motion to dismiss named plaintiff's injunctive relief claims in putative class action because she failed to "set forth any facts showing she face[d] a real and immediate threat of future harm," and thus did "not have Article III standing to obtain an injunction against Defendants"); *see also Weit*, 641 F.2d at 469 (affirming dismissal of vertical conspiracy claims against defendant Pullman in putative class action where no named plaintiff held Pullman credit cards at time suit was filed); *Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 741 (N.D. Ill. 2012) (dismissing for failure to plead causal *connection*

---

[2] Plaintiffs attempt to avoid this dispositive fact by repeatedly making the conclusory allegation that they "have paid above-competitive prices caused by the Becton–distributor conspiracies' cumulative effect sustaining Becton's market power and dominance in the relevant markets." SAC ¶ 7; *see also id.* ¶¶ 24, 26, 33–34, 71. But that effort fails because Plaintiffs must allege injury as a result of the alleged BD–Cardinal vertical conspiracy *alone*. *See* Section II.A.2, *infra*.

between alleged antitrust violation and injury); *Landmann v. Bann-Cor*, 2003 WL 23742558, at *3 (S.D. Ill. Feb. 10, 2003) ("As a constitutional matter, the 'Plaintiff must show that *he himself* is injured by the challenged action of the defendant.'" (emphasis added) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)); *accord Dickson v. Microsoft Corp.,* 309 F.3d 193, 200 n.7 (4th Cir. 2002) (noting that when plaintiffs amended their complaint to allege separate vertical conspiracies, rather than a hub and spoke conspiracy, plaintiffs "did not allege a separate [vertical] conspiracy between Microsoft and PB . . . because none of the named plaintiffs purchased a PC from PB").

### B. Plaintiffs Cannot Establish Article III Standing By Piggy-Backing On The Hypothetical Claims Of Unnamed Putative Class Members.

Plaintiffs cannot save their claims against Cardinal by "piggy-back[ing] on the [alleged] injuries of the unnamed [putative] class members." *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002). The Seventh Circuit has held that doing so "would be impermissible":

> [A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; . . . a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.

*Id. See also Landmann v. Bann-Cor*, 2004 WL 1944789, *4–6 (S.D. Ill July 16, 2004) (recognizing "general rule" in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), "that the court must first assure itself of its own jurisdiction," and then, "see[ing] no reason why simply framing a lawsuit as a class action removes the Named Plaintiffs' burden to demonstrate standing," dismissing for lack of standing claims against defendants holding no mortgage of any named plaintiff).

Because Plaintiffs cannot plead a causal connection between Cardinal and Plaintiffs' alleged overpayment for Products, the Court should dismiss Cardinal for lack of standing.

## II.  THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE A PLAUSIBLE VERTICAL CONSPIRACY TO UNREASONABLY RESTRAIN TRADE.

### A.  Plaintiffs' Vertical Conspiracy Allegations Do Not Allege the Required Element of Market Power or That Either Alleged Conspiracy Itself Restrained Trade.

#### 1.  Plaintiffs Fail to Plead Each Defendant Individually Has Market Power.

Vertical agreements have the potential to serve consumer interests and promote competition by allowing a manufacturer to achieve efficiencies in product distribution, provide better service, and/or advance consumer interests.  *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U. S. 36, 54–55 (1977) (explaining that vertical arrangements can promote competition and efficiencies in distribution, service, and promotions).  Because vertical agreements may be *pro*-competitive, they are *not* per se illegal, and, because they "do not generally give rise to the same concerns [as per se unlawful horizontal agreements] and often have pro-competitive effects," they are not judged under the per se rule.  *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008).

One requirement (among many) for a vertical arrangement to be unlawful is that each participant in the arrangement must have market power in the relevant product market(s).  *See GTE Sylvania*, 433 U.S. at 49, 59 (vertical agreements illegal only if they present anticompetitive effects); *see also Dickson*, 309 F.3d at 207–11 (for a vertical conspiracy claim to be viable, plaintiff must allege each participant's market power); Frank H. Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 ANTITRUST L.J. 135, 160 (1984) ("[T]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power.").  Market power is a "necessary ingredient" in every case challenging a vertical arrangement.  *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986); *see also Valley Liquors, Inc. v. Renfield Importers, Ltd*, 822 F.2d 656, 666 (7th Cir. 1987).  Market power is the "power to raise prices significantly above the competitive level without losing all of one's business." *Valley*

*Liquors*, 822 F.2d at 666.  Unless each alleged conspirator has market power, buyers can turn to other market participants, or even one or the other of the alleged conspirators, and the alleged conspiracy would have no anticompetitive effect. *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405–06 (7th Cir. 2002) (affirming dismissal where plaintiff acknowledged that the defendant had competitors and failed to allege facts showing why those competitors did not prevent the defendant from having market power); *Dickson*, 309 F.3d at 208 (concluding that, "given the failure to allege the market power of Compaq or Dell, Gravity is unable to show that Compaq or Dell has forced, or is likely to be able to force, supracompetitive prices on consumers for undesirable software features," plaintiff failed to adequately plead a vertical conspiracy between Microsoft and either Compaq or Dell).

Plaintiffs allege three relevant "Product Markets":  (1) conventional syringes, (2) safety syringes, and (3) safety IV catheters.  SAC ¶ 17.  Plaintiffs do not allege that either Cardinal or McKesson possesses market power or even participates in any of these markets.  Nor do they allege Cardinal or McKesson had the power to increase the price for its distribution services in any market.  Instead, Plaintiffs allege only that Cardinal and McKesson "control a massive share of the distribution of *medical devices and supplies*."  *Id.* ¶ 26 (emphasis added).  Plaintiffs neither allege this is a relevant market nor quantify what "massive" means.  Plaintiffs also allege nothing at all about Cardinal's or McKesson's respective shares of the distribution of any BD Product.

Nor is Plaintiffs' bare assertion that Cardinal and McKesson together "control a massive share" of medical supply distribution sufficient to support an inference of market power in any market, let alone the Product Markets.  While Plaintiffs complain that "Cardinal and other Becton distributors" construct "wide economic moats" to keep out entrants, Plaintiffs conspicuously do not allege which of those "other Becton distributors" has the benefit of the so-called "moats," or

even if they include McKesson,[3] *id.*, and anyway entrants are not needed to restrain competition where, as Plaintiffs acknowledge here, there are already currently strong competitors. To the extent the SAC says anything about the prices Cardinal and McKesson charge for their distribution services, Plaintiffs plead that Cardinal and McKesson have used their "large economies of scale" to "*lower*" prices for distribution services. SAC ¶ 30 (emphasis added). Unless lower prices are part of a predatory practice to price below cost, which is not alleged here, the antitrust laws do not prohibit, but instead encourage, them. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990). Plaintiffs' allegations show Cardinal and McKesson do not have market power. They compete with each other, and other distributors, who have forced them to lower prices—the polar opposite of alleging that either has market power.

Finally, Plaintiffs' allegations concede that neither Cardinal nor McKesson has market power in the Product Markets. The SAC alleges that there are "other distributors" in addition to Cardinal and McKesson that have not conspired with BD; those distributors "are willing to give their customers more freedom to choose non-Becton Products"; and each of Cardinal and McKesson is "at risk of losing profits and market share" to those distributors. SAC ¶ 61. These include O&M—"one of the largest distributors of Becton conventional syringes, safety syringes, and safety IV catheters in the United States," FAC ¶ 15—and Schein, *id.* ¶ 17. Thus, Plaintiffs' allegations refute any inference of either Cardinal's or McKesson's market power in any alleged relevant market.

---

[3] Nor does the citation-less metaphor about Cardinal's "moats" fill the fatal "market power" pleading gap. SAC ¶ 26. First, because it speaks of conduct allegedly engaged in by "Cardinal *and other Becton distributors*," it says nothing about Cardinal's individual power or share. *Id.* (emphasis added). Second, it is a quote about medical "devices and supplies" (of which there are thousands), not any of the Product Markets at issue here. *Id.*

Without an allegation of market power, there is no plausible answer to the question: "Why would a provider pay more for BD Products from Cardinal or McKesson, when those providers could purchase the same BD Products from other distributors, either at a lower price or without the unfair business practices?" The only way the actions alleged in the SAC could persist is if customers could not switch from Cardinal to McKesson, from McKesson to Cardinal, or from either to other distributors, such as O&M or Schein. Any other distributor—and Plaintiffs allege there are several powerful ones (including two they no longer allege conspired with BD)—would step in to correct any market imbalance. Cardinal would act to undercut McKesson, McKesson would act to undermine Cardinal, and O&M and Schein would act to undercut both. As this Court held in *42nd Parallel North*, where competitors exist, a plaintiff must allege facts showing the defendants have market power to state a vertical conspiracy claim. 286 F.3d at 405–06.

### 2. Plaintiffs Cannot Aggregate BD's, Cardinal's, and McKesson's Market Shares to Allege the Vertical Conspiracies Unreasonably Restrained Trade.

A vertical agreement also is unlawful if it creates an unreasonable restraint of trade. *GTE Sylvania*, 433 U.S. at 58–59. Plaintiffs attempt to plead restraint of trade by alleging that BD, Cardinal, and McKesson, *collectively*, restrained trade; they do not plead each alleged conspiracy's individual restraint on trade. *See* SAC ¶¶ 7, 24, 26, 71, 101, 108. But where, as here, a plaintiff asserts separate conspiracies, it may not aggregate anticompetitive effect. It must allege that each conspiracy is independently actionable. The Court of Appeals for the Fourth Circuit made this legal principle clear in *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210–11 (4th Cir. 2002).

In *Dickson*, plaintiffs alleged separate vertical conspiracies between Microsoft, as the manufacturer of its Windows Operating System, and each of Compaq and Dell, PC manufacturers that installed Windows on their computers before selling them to consumers. Compaq and Dell each moved to dismiss because plaintiffs had failed to allege that either of them had power in the

relevant PC market. The district court dismissed the case, and the Fourth Circuit affirmed, holding that for the plaintiff to assert a viable antitrust claim, "it was required to allege facts which, if proven true, would demonstrate that Compaq's or Dell's individual agreements with Microsoft were likely to result in an anticompetitive effect." *Id.* at 211. Without alleging facts showing either alleged conspiracy had the power to restrain trade, plaintiffs were unable to do so.

The court explained that, where, as here, plaintiffs allege separate conspiracies:

> each . . . agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies. . . . Indeed, to hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference.

*Id.* Thus, Plaintiffs' failure to plead that the alleged conspiracy between BD and Cardinal restrained trade is fatal to Count I. Likewise, their failure to plead that the alleged conspiracy between BD and McKesson restrained trade is fatal to Count II. *See, e.g., id.*; *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 681 (E.D. La. 2016) ("In assessing anticompetitive effects in the context of these vertical claims, the focus is not just on Pool's market share, but also on *whether each Manufacturer Defendant had market power* of antitrust concern." (emphasis added) (citing *Dickson*, 309 F.3d 207–11)).

### B. Plaintiffs Also Fail to Allege Conduct Supporting an Inference of Conspiracy Between Either BD and Cardinal, or Between BD and McKesson.

The SAC also is defective because Plaintiffs' own allegations refute any inference of a vertical conspiracy. The SAC's wrongful conduct allegations fall into two categories: (1) the contracts between BD and GPOs that the Seventh Circuit found did not support an inference of conspiracy; and (2) business conduct of Cardinal and McKesson. These allegations do not support an inference of either alleged conspiracy.

14

1. **The Seventh Circuit Rejected Antitrust Claims Against Cardinal and McKesson Based on the BD-GPO Contracts.**

In the FAC, Plaintiffs alleged that the Net Dealer Contracts by which BD and Plaintiffs agreed to the prices charged for Products formed the basis for antitrust liability against Cardinal and McKesson. FAC ¶¶ 42, 45, 47. The Seventh Circuit held these allegations insufficient to state a claim against Cardinal and McKesson because Plaintiffs made "no argument that the distributors play any role in setting the anticompetitive pricing." *Marion*, 952 F.3d at 843. The SAC continues to allege that the purportedly above-market prices Plaintiffs complain about were negotiated by Plaintiffs' GPOs and BD, without any involvement by either Cardinal or McKesson. SAC ¶¶ 35, 45. The Seventh Circuit's holding compels the Court to reject these allegations.

The Seventh Circuit also rejected conspiracy claims based on alleged distributor conduct that Plaintiffs re-allege here. In the FAC, Plaintiffs pled that the distributors, including Cardinal and McKesson, each "agree to distribute Becton's products pursuant to anticompetitive contractual terms[,] . . . enforce Becton's penalty pricing system, which penalizes the healthcare providers if they switch to a different manufacturer[, and] . . . make payments to the GPOs based on the volume of sales under the contracts." *Marion*, 952 F.3d at 842–43. Plaintiffs complained of bundling, volume discounts, and other aspects of the BD–GPO agreements that the GPOs voluntarily entered into on Plaintiffs' behalf. *Id.* The Seventh Circuit found these allegations, "taken alone or together," insufficient to establish the Distributors' participation in a conspiracy. *Id.* at 843. Plaintiffs nonetheless reassert them here. *Compare* SAC ¶¶ 45–47, *with* FAC ¶¶ 44–46. The Seventh Circuit's opinion forecloses an inference of conspiracy from these recycled allegations.

2. **Plaintiffs' New Allegations That Distributors Engaged in Improper Business Conduct Do Not State an Antitrust Violation.**

In an attempt to rehabilitate their failed conspiracy allegations, Plaintiffs now allege other conduct they claim that one or another distributor engaged in at some time. Plaintiffs' additional

allegations of improper business conduct by "Distributors"—without distinguishing between them—and without any allegation that either acted pursuant to an agreement with BD—allege, at most, business torts, not antitrust violations. *See* SAC ¶¶ 47–57.

Plaintiffs now claim "Distributors":

- Pressure providers to buy more BD products, and if pressure tactics do not work, cut off credit lines and increase delivery fees. SAC ¶ 47.

- Lie to providers to dissuade them from buying non-BD products, misrepresent prices, and make other false statements. SAC ¶ 48.

- Embed employees in hospitals to steer purchasers toward BD. SAC ¶ 52.

- Use BD's false "cost calculator" to show providers that BD's products cost less than its competitors' products. SAC ¶ 54.

- Pressure providers to use only one GPO contract, at BD's urging. SAC ¶ 56.

- Monitor their own employees to make sure they "are effective in enforcing" BD's exclusive-dealing terms, and give better evaluations to employees who "were successful in inducing providers to meet volume requirements." SAC ¶ 57.[4]

Even accepting these factual allegations as true, they are insufficient to state an antitrust claim.

***First***, these allegations reflect defective "group pleading." *See, e.g., In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384–86 (S.D.N.Y. 2016) (dismissing antitrust conspiracy claim against defendants as a group: "Plaintiffs must be able to separately state a claim against each and every defendant joined in this lawsuit"). Although the SAC alleges *no* relationship—let alone a conspiratorial one—between Cardinal and McKesson, Plaintiffs' allegations lump the two together, describing them as "Distributors" without distinguishing the alleged separate conduct of each. With one exception, the section of the SAC alleging the "Becton-Distributor Conspiracies"

---

[4] The SAC also asserts, without facts, that Distributors "may" (so, presumably, may not) require providers to buy a certain percentage of Products from a single distributor to divide up markets between distributors. SAC ¶ 55. This claim would require the distributors to have conspired with each other, but here Plaintiffs have tried to avoid the Seventh Circuit's skepticism by eschewing any horizontal conspiracy theory.

only mentions "Distributors" or "Cardinal and McKesson." *See* SAC ¶¶ 43–61.[5] The SAC does not allege wrongful conduct of each defendant. Courts reject group pleading when plaintiffs are attempting to allege a single conspiracy. And here, where Plaintiffs attempt to allege that Cardinal and McKesson have each engaged in *separate* conspiracies with BD, this group pleading fails all the more. Plaintiffs must, but do not, allege acts that give rise to a plausible inference of conspiracy by each alleged co-conspirator in each alleged conspiracy.

*Second*, absent plausible allegations that the alleged conduct harmed competition, as here, the alleged acts are not antitrust violations. While "many kinds of conduct may prevent or discourage a potential competitor from entering a particular market, . . . [f]ederal antitrust laws are implicated only when that conduct is predatory or unjustifiable." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). The Seventh Circuit has made clear that "[i]solated business torts . . . do not typically rise to the level of [an antitrust] violation unless there is a harm to competition itself." *Id.* Even if actions were "somewhat aggressive or heavy-handed, the antitrust laws do not prohibit 'conduct that is only unfair, impolite, or unethical.'" *Id.* at 855–86 (quoting *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989)).

Addressing similar allegations against BD in *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016), the Fifth Circuit held that alleged business torts involving the marketing of syringes and catheters did not amount to an antitrust conspiracy. *Id.* at 893, 897–98. In *Retractable*, a competitor sued BD under the antitrust laws based on claims BD engaged in patent infringement, false advertising, and market tainting. A jury found for plaintiff,

---

[5] The one exception relates to Cardinal's acquisition of Covidien. SAC ¶ 50. Plaintiffs make the conclusory claim that Cardinal preferred selling Becton Products over Covidien Products post-acquisition but do not allege facts establishing even a single circumstance when that occurred. Plaintiffs do not even allege they agreed to purchase BD Products from Cardinal, and without such an agreement, a provider would be free to purchase Covidien products instead.

but the Fifth Circuit reversed, explaining: (1) the Sherman Act does not prohibit unfair conduct, even by a monopolist; (2) "disreputable" business conduct is not an antitrust violation; and (3) the antitrust laws do not create a "federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Id*. at 892–93 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 255 (1993)).

Moreover, as explained above, Plaintiffs do not allege that either Cardinal or McKesson has market power, and without market power, even hypothetical bad business conduct cannot harm competition. As the Seventh Circuit explained in *Havoco of America, Ltd. v. Shell Oil Co*., 626 F.2d 549, 557 (7th Cir. 1980), in addressing whether business conduct is an antitrust violation, "the sole question is whether those means lessened competition. . . . [U]nfair competition is still competition, and will be actionable under the antitrust laws generally only where a defendant with substantial market power uses unfair means to increase its share of the market by eliminating a competitor, thereby creating the risk of a monopoly." *Id*. In so holding, the Seventh Circuit relied on "the repeated view of the Supreme Court that the antitrust laws do 'not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Id*. (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945)). Without an allegation that each defendant possessed market power and each engaged in specific business conduct to stifle competition in the relevant market, allegations of bad business conduct "do not state a cause of action under section one of the Sherman Act." *Mar Food Corp. v. Doane*, 405 F. Supp. 730, 730 (N.D. Ill. 1975).

***Third***, the alleged conduct is not actionable because it is consistent with each distributor's self-interest, and Plaintiffs do not offer any allegations (plausible or otherwise), that Cardinal agreed with BD, and McKesson separately agreed with BD, to engage in any of these acts. To allege an antitrust conspiracy, a plaintiff also must plead a defendant had "a conscious commitment

to a common scheme designed to achieve an *unlawful* objective." *Marion*, 952 F.3d at 841 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 768 (1984) (emphasis added)). In assessing a complaint's allegations, "facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1049 (9th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–58, 557 n.5 (2007)).

Plaintiffs ask the Court simply to *infer* that Cardinal and McKesson each separately agreed with BD to engage in conduct to cause their customers to purchase BD Products at inflated prices. But that inference is unreasonable because, without the critical allegation that Cardinal or McKesson had market power such that their customers had no choice but to pay BD's prices, those customers could turn instead "to other distributors who are willing to give their customers more freedom to choose non-Becton Products." SAC ¶ 61. Given the existence of other distributors to which Cardinal and McKesson were each "at risk of losing profits and market share," *id.*, each would persist in the conduct only if it promoted its individual economic self-interests. Otherwise, engaging in actions to benefit BD would cause each of Cardinal and McKesson to lose sales to those other distributors. A party pursuing its own economic self-interest is not a conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

But that is all that Plaintiffs' new allegations establish. Plaintiffs allege Cardinal and McKesson independently sought to increase the amount of BD Products they distribute, allegedly using unfair practices, at the expense of their distributor competitors. Each action alleged in the SAC is a method by which Cardinal or McKesson could increase its revenue. Pressuring customers to purchase more of a Product that the distributor markets and rewarding employees who increase

sales are means for a distributor to increase its own sales and profits, and, thus, are consistent with each distributor's independent self-interest.

Nor do Plaintiffs plausibly allege that Cardinal or McKesson could increase their respective profits more by selling syringes and catheters manufactured by someone other than BD. Plaintiffs allege that BD has a "dominant share" of the Product Markets, SAC ¶ 25, and that shifting between Products is impeded by the GPO contracts, regulatory barriers, patent issues, and lack of transparency in the GPO relationships, *see id.* ¶¶ 25, 27–29, 31–32. None of these impediments is the result of conduct by Cardinal or McKesson. Thus, efforts to increase sales of BD Products are necessarily in the individual economic interest of each of Cardinal and McKesson, and Plaintiffs again have failed to state a viable claim for conspiracy.

## CONCLUSION

The time has come for this case to end. Just like Plaintiffs' prior complaints, the SAC is deficient as a matter of law. Plaintiffs have had more than ample opportunity to state viable claims. The Court should now dismiss this case *with prejudice*.

Dated: November 6, 2020

Respectfully submitted,

/s/  *Richard L. Stone*

Michelle K. Fischer (*pro hac vice*)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-7096

Richard L. Stone (*pro hac vice*)
David R. Singer (*pro hac vice*)
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054
(213) 239-5100

Paula W. Render (*pro hac vice*)
Jones Day
77 West Wacker Drive
Chicago, IL 60601-1692
(312) 269-1555

Michael T. Brody
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654-3456
(312) 222-9350

*Counsel for Cardinal Health, Inc.*

*Counsel for McKesson Medical-Surgical, Inc.*

**CERTIFICATE OF SERVICE**

I, Richard L. Stone, an attorney, certify that on November 6, 2020, I caused **The Distributor Defendants' Motion to Dismiss and Memorandum in Support** to be served on all counsel of record listed in the Court's ECF system.

Dated: November 6, 2020

/s/ *Richard L. Stone*
*Counsel for McKesson Medical-Surgical, Inc.*